The MOTOR AND EQUIPMENT MANU-
FACTURERS ASSOCIATION,
INC., Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY and Douglas Costle, Adminis-
trator, Environmental Protection Agen-
cy, Respondents,

Automobile Importers of America and
State of California, Intervenors.

AUTOMOTIVE SERVICE INDUSTRY
et al., Petitioners,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent,

State of California and Automobile
Importers of America, Intervenors.

MOTOR VEHICLE MANUFACTURERS
ASSOCIATION OF the UNITED
STATES, INC., Petitioner,

v.

Douglas M. COSTLE, Administrator of the
Environmental Protection Agency Envi-
ronmental Protection Agency, Respon-
dents,

State of California and Automobile
Importers of America, Intervenors.

CHRYSLER CORPORATION, Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent,

State of California and Automobile
Importers of America, Intervenors.

GENERAL MOTORS CORPORATION,
Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and Douglas
M. Costle, Administrator of the United
States Environmental Protection Agen-
cy, Respondents,

State of California and Automobile
Importers of America, Intervenors.

Nos. 78–1896, 78–1901, 78–1931,
78–1943 and 78–1944.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 26, 1979.

Decided Aug. 3, 1979.

As Amended Aug. 7, 1979.

Rehearing Denied Sept. 17, 1979.

John H. Pickering, Washington, D. C., with whom Timothy N. Black, Washington, D. C., and Charles H. Lockwood, Detroit, Mich., were on the brief, for petitioner in No. 78–1931.

William T. Coleman, Jr., Washington, D. C., with whom Richard C. Warmer, Donald T. Bliss, Jr., Washington, D. C., and William L. Weber, Jr., Detroit, Mich., were on the brief, for petitioner in No. 78–1944.

Mark R. Joelson, Washington, D. C., with whom Marc L. Fleischaker and Lawrence P. Postol, Washington, D. C., were on the brief, for petitioner in No. 78–1896.

James F. Flanagan, Chicago, Ill., with whom Harold T. Halfpenny, Chicago, Ill., was on the brief, for petitioner in No. 78–1901.

Victor C. Tomlinson, Detroit, Mich., was on the brief, for petitioner in No. 78–1943.

James McNab, III, Atty., E. P. A., Washington, D. C., a member of the bar of the Supreme Court of Cal., pro hac vice, by special leave of court, Bruce I. Bertelsen, Atty., E. P. A., Washington, D. C., a member of the bar of the Supreme Court of Mich., pro hac vice, by special leave of court, and David E. Dearing, Atty., Dept. of Justice, Washington, D. C., with whom Sanford Sagalkin, Acting Asst. Atty. Gen., Joan Z. Bernstein, Gen. Counsel, and Gerald K. Gleason, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondent. James Moorman and Lloyd S. Guerci, Attys., Dept. of Justice, Washington, D. C., also entered appearances for respondents.

Joel S. Moskowitz, Deputy Atty. Gen. of the State of Cal., Sacramento, Cal., for intervenor State of Cal.

Milton D. Andrews, Donald M. Schwentker and Lance E. Tunnick, Washington, D. C., were on the brief for intervenor Automobile Importers of America, Inc.

Before WRIGHT, Chief Judge, and MacKINNON and ROBB, Circuit Judges.

Opinion for the Court filed by MacKINNON, Circuit Judge.

MacKINNON, Circuit Judge:

Section 209 of the Clean Air Act, 42 U.S.C. § 7543 (Supp. I 1977), requires the Administrator of the Environmental Protection Agency (EPA) to waive federal preemption of motor vehicle emission control regulations for the State of California unless he makes certain findings that a waiver is inappropriate.[1] In July 1978 the Administrator waived federal preemption for Cali-

---

1. Section 209 as amended in 1977 provides:

(a) Prohibition

No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

(b) Waiver

(1) The Administrator shall, after notice and opportunity for public hearing, waive application of this section to any State which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, if the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. No such waiver shall be granted if the Administrator finds that—

(A) the determination of the State is arbitrary and capricious.

(B) such State does not need such State standards to meet compelling and extraordinary conditions, or

(C) such State standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title.

(2) If each State standard is at least as stringent as the comparable applicable Federal standard, such State standard shall be deemed to be at least as protective of health and welfare as such Federal standards for purposes of paragraph (1).

(3) In the case of any new motor vehicle or new motor vehicle engine to which State standards apply pursuant to a waiver granted

fornia regulations limiting the amount of maintenance that a manufacturer can require of motor vehicle purchasers in the written instructions which accompany new motor vehicles sold in that State. The issue in these cases [2] is whether the Administrator's decision to do so was arbitrary, capricious, or otherwise not in accordance with law. We answer that question in the negative, and we accordingly deny the petition to set aside the Administrator's order.[3]

## I

## BACKGROUND

The federal program for the control of motor vehicle emissions is the product of the Clean Air Act as amended, 42 U.S.C. § 7401 et seq. (Supp. I 1977).[4] Section 202 of this statute establishes nationwide motor vehicle emission standards applicable to certain model years for three major pollutants, carbon monoxide, hydrocarbons, and oxides of nitrogen. Id. § 7521(b). It also sets long-term goals for the control of emissions, and authorizes the EPA Administrator to prescribe standards consistent with those goals for model years not covered by the statute. Id. § 7521(a). These regulations can take effect at such time as the Administrator finds them to be technologically feasible, giving appropriate consideration to the costs of compliance. Id.

---

under paragraph (1), compliance with such State standards shall be treated as compliance with applicable Federal standards for purposes of this subchapter.

(c) Certification of vehicle parts or engine parts

Whenever a regulation with respect to any motor vehicle part or motor vehicle engine part is in effect under section 7541(a)(2) of this title, no State or political subdivision thereof shall adopt or attempt to enforce any standard or any requirement of certification, inspection, or approval which relates to motor vehicle emissions and is applicable to the same aspect of such part. The preceding sentence shall not apply in the case of a State with respect to which a waiver is in effect under subsection (b) of this section.

(d) Control, regulation, or restrictions on registered or licensed motor vehicles

Nothing in this part shall preclude or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles.

42 U.S.C. § 7543 (Supp. I 1977). California is the only state which had adopted emission control standards (other than crankcase emission standards) before March 30, 1966. It is thus the only state eligible for a waiver.

**2.** This opinion disposes of the petitions filed in Docket Nos. 78–1896, 78–1901, 78–1931, 78–1943, and 78–1944, each of which challenges the Administrator's July 1978 decision to waive federal preemption for California's in-use maintenance regulations. Petitioners in Docket Nos. 78–1896, 78–1931, 78–1943, and 78–1944 include The Motor & Equipment Manufacturers Association, the Automotive Service Industry Association, the Motor Vehicle Manufacturers Association of the United States, the Chrysler Corporation, and the General Motors Corporation. These petitioners jointly raise all the issues discussed herein except for those relating

to the Administrator's obligation to consider the antitrust implications of the waiver. The antitrust implications of the waiver are the concern of the petition filed in Docket No. 78–1901. Petitioners in that case are The Automotive Service Industry Association and the Motor & Equipment Manufacturers Association, Inc. For ease of reference, we refer to the proponents of the waiver denial as "petitioners" throughout this opinion, but we wish to make clear that not all the parties join in the argument about the antitrust implications of the Administrator's decision to waive preemption.

Argued with the foregoing petitions was the petition filed in Docket No. 78–1794. Although this petition challenges a different waiver decision, it raises essentially the same issues discussed herein. We dispose of it as a companion to this opinion. *Motor & Equipment Manufacturers Assn. v. EPA*, 201 U.S.App.D.C. ——, 627 F.2d 1128 (1979).

**3.** Our jurisdiction derives from 42 U.S.C. § 7607(b)(1) (Supp. I 1977).

**4.** The Clean Air Act includes the basic legislation enacted as The Clean Air Act of 1963, Pub.L.No. 88–206, 77 Stat. 392, as well as amendments made by The Motor Vehicle Air Pollution Control Act, Pub.L.No. 89–272, 79 Stat. 992 (1965); The Clean Air Act Amendments of 1966, Pub.L.No. 89–675, 80 Stat. 954; The Air Quality Act of 1967, Pub.L.No. 90–148, 81 Stat. 485; The Clean Air Act Amendments of 1970, Pub.L.No. 91–604, 84 Stat. 1676; The Comprehensive Health Manpower Training Act, Pub.L.No. 92–157, 85 Stat. 431 (1971); The Energy Supply & Environmental Coordination Act, Pub.L.No. 93–319, 86 Stat. 248 (1974); The Safe Drinking Water Act of 1977, Pub.L.No. 95–190, 91 Stat. 1399; and The Clean Air Act Amendments of 1977, Pub.L.No. 95–95, 91 Stat. 685.

Section 206 requires the Administrator to test or to have tested any new motor vehicle or new motor vehicle engine submitted by a manufacturer to determine whether the vehicle or engine conforms to the standards contained in section 202 and in the regulations promulgated under it. *Id.* § 7525(a).[5] This "certification process" consists of various procedures which enable a manufacturer to demonstrate by use of a prototype that it has designed a class of motor vehicle which complies with the standards. One feature of this certification process is a durability test to determine the effects of deterioration on the functioning of the emission control system.[6] The Administrator limits by regulation the amount of "scheduled maintenance" that can be performed on the prototype vehicle during this durability test.[7]

If the Administrator finds that the new motor vehicle will meet the applicable emissions standards he issues a certificate of conformity to cover the class of motor vehicles represented by the prototype. *Id.* at § 7525(a). This certificate is a condition precedent to the initial retail sale of new motor vehicles.[8]

Section 207 imposes two types of warranty obligations on manufacturers which are directly related to the standards issued in section 202. First it requires manufacturers to warrant to purchasers that each new motor vehicle is designed, built, and equipped to conform to the section 202 standards, and further to warrant that each is free of defects in materials and workmanship which cause a motor vehicle to fail to conform to the standards for their useful life. *Id.* § 7541(a).[9] This is the defect warranty. Second, it provides that the Administrator shall impose a "performance warranty" on manufacturers whereby manufacturers will bear the costs of remedying any nonconformity with section 202 emission standards on vehicles maintained in accordance with the written maintenance instructions required by the statute. *Id.* § 7541(b).[10] The written maintenance in-

---

**5.** Whenever the statute refers to "new motor vehicle" the phrase is followed by "or new motor vehicle engine." We hereafter refer to "new motor vehicle" as including "new motor vehicle engine."

**6.** The regulations governing the federal certification program are found in 40 C.F.R. § 86.078 (1978).

**7.** *See id.* § 86.078–25. The durability test is designed to ensure that a vehicle's emission control system will retain its control capacity, a purpose obviously frustrated if the manufacturer is permitted to repair the system at will. As will inevitably happen on occasion, if a part fails before maintenance is scheduled, "unscheduled maintenance" must be undertaken.

**8.** Section 203 prohibits a manufacturer from introducing into commerce a new motor vehicle not covered by a certificate of conformity. 42 U.S.C. § 7522(a)(1) (Supp. I 1977). Section 205 provides for the imposition of a civil penalty of up to $10,000 for violations of this prohibition. *Id.* § 7524. In addition to prescribing the certification process, section 206 authorizes the Administrator to develop "test procedures" to determine whether motor vehicles under production actually conform to the standards pursuant to which the certificate of conformity was issued. If these tests reveal that the manufactured vehicles do not so conform, the Administrator is empowered to suspend, revoke, or modify the certificate. *Id.* § 7525(b).

**9.** Section 207 refers to section 202 for its definition of "useful life." 42 U.S.C. § 7541(a) (Supp. I 1977). Section 202 defines the useful life of light duty vehicles (and engines) and of "other motor vehicles" (and engines) as five years or fifty thousand miles, whichever first occurs. *Id.* § 7521(d). The Administrator can make an upward adjustment in the useful life of "other motor vehicles" if he determines that a period of greater duration or mileage is appropriate. *Id.*

**10.** Before imposing a performance warranty the Administrator must first determine that there are methods and procedures which accord with good engineering practices and which are capable of correlation to the certification process that can ascertain whether new motor vehicles in actual use comply with the section 202 standards for their useful life. 42 U.S.C. § 7541(b) (Supp. I 1977). The performance warranty like its counterpart runs to the ultimate and any subsequent purchaser. *Id.* Whereas section 202's definition of useful life governs the duration of the defect warranty, however, the performance warranty applies to the entire "emission control device or system" only for twenty-four months or twenty-four thousand miles, whichever first occurs. *Id.* The performance warranty thereafter applies only to "a catalytic converter, thermal reactor, or other component installed on or in a vehicle for the sole or primary purpose of reducing vehicle emissions." *Id.*

structions, which manufacturers must furnish with each new motor vehicle, must conform to regulations promulgated by the Administrator. *Id.* § 7541(c)(3). If the purchaser fails to comply with the written instructions it relieves the manufacturer of his performance warranty obligations.[11]

By virtue of the unique status it enjoys under section 209 of the Clean Air Act, California has an emissions control program that parallels the federal program in many respects. This litigation grew out of a decision made by the California Air Resources Board (CARB), which is California's version of the federal EPA in the area of emissions control regulations. In May 1977, the CARB adopted regulations limiting the amount of scheduled maintenance that can be performed on the prototype used in the durability testing during California's certification process.[12] No party in this court challenges the application of these maintenance restrictions to the certification process. Rather the object of challenge is the CARB's simultaneous decision to limit the maintenance a manufacturer can require of purchasers in the written instructions manufacturers must furnish with each new motor vehicle. Under these "in-use maintenance regulations," a manufacturer cannot require a purchaser to perform maintenance beyond that which a manufacturer can perform during the certification process.[13] The furnishing of written instructions

which abide by the in-use maintenance regulations is a condition precedent to the initial retail sale of new motor vehicles in California. The regulations also define the manufacturers' warranty obligations.

Foreshadowing the CARB's decision to adopt the regulations was a series of public hearings and workshops the CARB held to discuss proposed regulations limiting certification and in-use maintenance. At the first of these meetings, held in November 1976, the major topic was a CARB staff report which stated that "[d]ata available from emissions testing of in-use vehicles show that the degree of emission control which was demonstrated during the certification program is not being realized."[14] The staff contended that one of the reasons the emissions systems on in-use vehicles were not controlling emissions as they had during certification was improper maintenance on emission-related parts. The staff suggested that by lowering the amount of maintenance that needed to be done on in-use vehicles, the CARB could reduce the risks of improper maintenance and encourage the production of more durable emission-related parts.

This staff report contained recommendations on the amount of maintenance that ought to be allowed, but owing to objections by manufacturers the CARB deferred any decision on the proposals. Over the

---

**11.** At the time this controversy arose, the Administrator had not yet made the requisite findings and thus had not promulgated regulations governing maintenance instructions. *See* 43 Fed.Reg. 32182, 32184 (1978).

**12.** The regulations restrict the scheduled maintenance to the inspection, replacement, cleaning, adjustment, or service, at specified intervals, as follows: drive belt tension (at 30,000 miles), exhaust gas sensor (30,000), spark plugs (30,000), choke lubrication (30,000), and valve lash (15,000). If the manufacturer can show that such maintenance is actually done in use, it may additionally schedule maintenance for the engine idle speed, the valve lash, and the engine bolt torque at 5,000 miles. California Exhaust Emission Standards & Test Procedures ¶ 3f (1978), *reprinted in* Joint Appendix Statutory Supplement (J.A.S.S.) at 263–65. These regulations apply to 1980 and subsequent model year gasoline-powered passenger cars and to

1981 and subsequent model year gasoline-powered light duty trucks and medium duty vehicles. *Id.* The regulations are incorporated by reference in 13 Cal.Admin.Code § 1960(c).

**13.** *See* note 12 *supra*. The one difference is that for in-use maintenance the CARB's Executive Officer can approve additional in-use maintenance requirements which he finds necessary to account for extreme driving conditions or to ensure safe operation. California Exhaust Emission Standards & Test Procedures ¶ 3g (1978), *reprinted in* J.A.S.S. at 267–68; *see* Amendments to California Exhaust Emission Standards & Test Procedures, ¶ 1 (1979), *reprinted in* Joint Appendix (J.A.) at A110; note 18 *infra*.

**14.** California Air Resources Board, Staff Report No. 76–22–2(b), 1 (November 23, 1976), *reprinted in* J.A. at 102.

next six months, the CARB staff studied the problem further, concentrating particularly on the questions raised by manufacturers about the technological feasibility of limiting maintenance on various parts.[15] The final recommendations the staff made to the CARB significantly altered the staff's earlier recommendations on ·the amount of maintenance a manufacturer could require of motor vehicle purchasers.[16] The CARB solicited comments from manufacturers and other interested parties on these proposals.

 After formally adopting the regulations the CARB wrote to the EPA requesting a waiver pursuant to section 209.

In accordance with the statute the Administrator conducted a public hearing at which all interested parties were invited to offer testimony for and against the waiver request. After this hearing was held, Congress amended the Clean Air Act, altering among other things the waiver provision.[17] The Administrator announced that he would conduct another hearing to explore the implications of these amendments for the CARB's regulations. In the interim, the CARB adopted a resolution in which it found that the maintenance regulations "individually and collectively" met the requirements imposed by the amendments.[18] The CARB introduced this resolution and the

---

**15.** In December 1976, the CARB conducted workshops for members of its staff and representatives of the motor vehicle manufacturers and parts and services industry. Although the staff concluded after these workshops that the statements of manufacturers "support most of the reduction in allowable maintenance . . . proposed by the staff," it concluded that additional study on technological feasibility and related problems was necessary before any final decision on the proposals. California Air Resources Board, Supplement to Staff Report No. 76–22–2(b), 10–11 (December 14, 1976), *reprinted in* J.A. at 124. Many of the manufacturers' objections related to the CARB staff's use of a study on technological feasibility based only on mileage (as opposed to mileage and time) intervals. *See* text accompanying notes 62–63 *infra.* Acting on the staff recommendation, the CARB postponed consideration of the in-use maintenance regulations. California Air Resources Board, Minutes of Meeting 76–23, 1 (December 14, 1976), *reprinted in* J.A. at 112.

In January 1977, the CARB staff sent out questionnaires soliciting information on technological feasibility. In April, the staff issued another report in which it significantly altered the proposed maintenance restrictions. *See* note 16 *infra.* Public hearings were held on the proposals in April and in May.

**16.** *See* California Air Resources Board, Staff Report No. 77–12–1, 17 (May 26, 1977), *reprinted in* J.A. at 178. These recommendations did not significantly differ from those advanced in April. *See* California Air Resources Board, Staff Report No. 77–9–2, 17 (April 28, 1977), *reprinted in* J.A. at 142. The original staff recommendations would have limited maintenance to the adjustment of the valve lash at 15,000 miles and the air filter at 30,000 miles. *See* California Air Resources Board, Staff Report No. 76–22–2(b), 8 (November 23, 1976), *reprinted in* J.A. at 109.

**17.** Clean Air Act Amendments of 1977, Pub. L.No. 95–95, § 207, 91 Stat. 755. The 1977 amendments applied to pending waiver requests. *See* 42 Fed.Reg. 45942 (1977), *reprinted in* J.A. at 52–54.

**18.** California Air Resources Board, Resolution No. 77–48, 4 (September 29, 1977), *reprinted in* J.A. at 279. This resolution was based on a staff report which concluded that the in-use maintenance regulations, when coupled with other revisions in the State's emissions control program, would result in identifiable emissions benefits. California Air Resources Board, Staff Report No. 77–20–2, 24 (September 12, 1977), *reprinted in* J.A. at 229. *See* note 59 *infra.*

A large portion of the manufacturers' complaints about the in-use maintenance regulations rested on the CARB's original decision to restrict what a manufacturer could recommend to—as opposed to require of—motor vehicle purchasers. The manufacturers reasoned that they ought to be able to suggest any maintenance they believed reasonable and necessary. In response to these criticisms, the CARB in February 1979 decided to adopt emergency amendments to its in-use maintenance regulations to clarify what a manufacturer could and could not include in the written instructions. *See* California Air Resources Board, Notice of Public Hearing, 1 (February 22, 1979), *reprinted in* J.A. at A104. These regulations permit the manufacturers to recommend additional maintenance as long as they make clear that this recommended maintenance is not required. Amendments to California Exhaust Emission Standards & Test Procedures ¶ 1 (1979), *reprinted in* J.A. at A110; *see* California Air Resources Board, Staff Report [Unnumbered], 2–3 (March 2, 1979), *reprinted in* J.A. at A117–18. The regulations were formally confirmed by the CARB after oral argument in these cases. *See* Joint Supp. Memo of Petitioners at 5–6.

As the dates indicate, the emergency amendments post-dated the Administrator's waiver

accompanying staff report at the second EPA hearing on the waiver request.

Nine months after the second hearing the Administrator announced his decision to waive federal preemption of the in-use maintenance regulations. He offered two basic reasons for his decision. First, he said, there was no plausible evidence in the record to indicate that California's new in-use maintenance regulations would impair the ability of California's emission standards—for which a waiver had already been granted—to protect the public health and welfare at least as ably as the corresponding federal standards. Second, he said, the manufacturers had failed to show that adherence to the regulations would be technologically infeasible, the costs of compliance considered. The Administrator concluded that lacking such evidence he had no alternative but to grant the waiver request.

These petitions ensued.

## II

## STANDARD OF REVIEW

At the outset we note the modest scope of our inquiry. Three points bear emphasis. First, our review here is of the Administrator's decision to waive federal preemption for the State of California, not of California's decision to adopt the in-use maintenance regulations. Our concern is whether a federal officer properly discharged his responsibilities under a federal statute. If petitioners dislike the substance of the CARB's regulations, or if they believe the procedures the CARB used to enact them were unsatisfactory, then they are free to challenge the regulations in the state courts of California.

Second, section 706 of the Administrative Procedure Act, 5 U.S.C. § 706 (1976), governs our examination of whether the Administrator properly discharged his responsibilities under section 209. *Ascaro v. Environmental Protection Agency*, 188 U.S.App.D.C. 77, 83, 578 F.2d 319, 325 (1978); *National Association of Demolition Contractors, Inc. v. Costle*, 184 U.S.App. D.C. 173, 175 n. 1, 565 F.2d 748, 750 n. 1 (1977). This means we must uphold the Administrator's action unless we find that it is " 'arbitrary and capricious, . . . or otherwise not in accordance with law' or if [it] fails to meet statutory, procedural, or constitutional requirements." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971) (quoting 5 U.S.C. § 706). We cannot substitute our judgment for that of the Administrator. *Ethyl Corp. v. Environmental Protection Agency*, 176 U.S.App. D.C. 373, 406, 541 F.2d 1, 34 (en banc), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). We must instead presume that the Administrator acted lawfully and so conclude unless our thorough inspection of the record yields no discernible rational basis for his action. *See Barrier Industries Inc. v. Eckard*, 190 U.S.App.D.C.

---

decision and thus obviously played no part in it. Some of the petitioners therefore argue that the regulations are not properly before this court.

It is basic that agency action cannot be sustained on the basis of information not relied upon by the agency or disclosed in its record of consideration. *Gulf States Utilities Co. v. FPC*, 411 U.S. 747, 764, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973). Although this court has sanctioned supplementation of the record in certain circumstances, *see Amoco Oil Co. v. EPA*, 163 U.S.App.D.C. 162, 169 n.10, 501 F.2d 722, 729 n.10 (1974), the practice decidedly is the exception not the rule. The problem here, however, is very different from the situation in which the agency seeks to support an unchanged agency rule or order of continuing effect with new evidence never tested in the administrative process. Rather here there is a fundamental change in the state of affairs: the regulations to which petitioners primarily object no longer exist. A cornerstone of our jurisprudence is that an Article III court does not sit to issue advisory opinions on abstract questions. Were we to ignore the public record of the CARB's amendments we would in effect be deciding a hypothetical question. Consequently, taking judicial notice of the CARB amendments, we hold that insofar as petitioners' claims pivot on the earlier restrictions on what manufacturers could recommend to (as opposed to require of) vehicle owners, these claims are moot. *Cf. EPA v. Brown*, 431 U.S. 99, 103, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977) (per curiam) (subsequent change in effect of regulations renders controversy moot).

93, 98, 584 F.2d 1074, 1079 (1978); *Appalachian Power Co. v. Environmental Protection Agency*, 579 F.2d 846, 851 (4th Cir. 1978). The Administrator must give reasoned consideration to the issues before him and reach a result which rationally flows from this consideration. If he does so, and presents that rational basis in his decision, then his decision is not arbitrary and capricious. *National Association of Food Chains, Inc. v. ICC*, 175 U.S.App.D.C. 346, 352, 535 F.2d 1308, 1314 (1976) (per curiam); *Greater Boston Television Corp. v. FCC*, 143 U.S. App.D.C. 383, 393, 444 F.2d 841, 851 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

■ Third, aware of the technical expertise and need for flexibility of administrative agencies, courts typically defer to a nearly contemporaneous construction of a statute by an agency charged with administering it. *See International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979); *United States v. National Association of Securities Dealers*, 422 U.S. 694, 719, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975). Applying this principle the Supreme Court has held that the EPA's interpretation of the Clean Air Act is entitled to considerable respect. *Union Electric Co. v. Environmental Protection Agency*, 427 U.S. 246, 256, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1978); *Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60, 75, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). "The construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1967); *accord, Beal v. Doe*, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977); *United States v. Burlington & Missouri River Railroad Co.*, 98 U.S. (8 Otto) 334, 341, 25 L.Ed. 198 (1879). For us to conclude that the Administrator misconstrued section 209 petitioners must show by clear and convincing evidence that his construction is unreasonable.

Thus mindful of our restricted rule, we turn to consider petitioners' claims. Petitioners posit five basic questions for decision. First, does section 209(b) empower the Administrator to consider a waiver of federal preemption for the CARB's in-use maintenance regulations? Second, if it does, what questions must the Administrator address before granting the waiver? Third, assuming the Administrator addressed the correct questions, how must he go about dealing with them? Fourth, if the Administrator properly addressed the correct questions, is there a discernible rational basis for the decision he reached? Finally, does the Administrator's decision to waive violate constitutional requirements? We examine these questions in turn.

### III

### THE SCOPE OF THE WAIVER POWER

The first question for decision is whether section 209 empowers the Administrator to consider a waiver of federal preemption for California's in-use maintenance regulations. Petitioners argue that the in-use maintenance regulations are not aimed at emissions control performance of new motor vehicles but instead purport to regulate in-use performance and post-sale obligations of manufacturers. As such, they contend, the regulations intrude on the pervasive federal regulatory scheme embodied in section 207, 42 U.S.C. § 7541 (Supp. I 1977), and are not subject to waiver under subsection (b) of section 209. Petitioners acknowledge that absent some provision for waiver the regulations are preempted by subsection (a) of section 209. They thereby avoid any explicit suggestion that section 207 alone effects a preemption of the CARB's in-use maintenance regulations and exclusively rely on a theory that subsection (b)'s waiver power is circumscribed by section 207.

The Administrator rejected this claim on the ground that the only relevant preemption provision is the express terms of subsection (a) and that whatever is preempted therein is subject to waiver under subsection (b). We agree.

■ Nothing in section 209 supports petitioners' one-way approach to waiver of fed-

eral preemption for California. Subsection (b) provides that unless the Administrator makes certain findings he must "waive application *of this section*" to California. 42 U.S.C. § 7543(b)(1) (Supp. I 1977) (emphasis added), *reprinted in* note 1 *supra*. The underscored phrase has no conceivable meaning other than to refer to subsection (a).[19] Subsection (a) forbids any state from "adopt[ing] or attempt[ing] to enforce" standards relating to emissions from new motor vehicles, and from imposing any requirements relating to same as a "condition precedent" to the initial retail sale of motor vehicles. *Id.* § 7543(a). California's in-use maintenance regulations are attempts to enforce California's emission standards, and compliance with the regulations is a condition precedent to the initial retail sale of motor vehicles in California. The in-use maintenance regulations are, therefore, preempted by subsection (a). Subsection (b) authorizes the Administrator to waive application of subsection (a) for California; it contains no suggestion that the scope of this authority is something other than that defined by subsection (a). Hence the Administrator is empowered to waive federal preemption for California's in-use maintenance regulations.

**19.** Section 209 contains a subsection (c) and subsection (d). *See* note 1 *supra*. Subsection (c) preempts states from certifying automotive parts, 42 U.S.C. § 7543(c) (Supp. I 1977), which is part of Congress' effort to lessen the anticompetitive consequences of the warranty obligations, *see* H.R.Rep. No. 294, 95th Cong., 1st Sess. 293–94 (1977), U.S.Code Cong. & Admin. News 1977, p. 1077. By its own terms subsection (c) does not apply to California. If anything, this tends to belie petitioners' claims that Congress did not intend California to regulate in the post-sale warranty area as an incident to its power to adopt and enforce its own emission standards. Subsection (d) makes clear that the preemption provision is not intended *to preempt state regulation other than as ex-*pressed in subsection (a). 42 U.S.C. § 7543(d) (Supp. I 1977). This too has consequences for petitioners' argument. Petitioners suggest that the in-use maintenance regulations are not aimed at controlling emissions from new motor vehicles, but if this is so (and we hold it is not), then California need not even seek a waiver because subsection (d) preserves the field of regulation of *old* motor vehicles to state control *ab initio*.

The plain meaning of the statute indicates that Congress intended to make the waiver power coextensive with the preemption provision. Petitioners' efforts to reduce the phrase "of this section" to a truism would, if successful, render the California waiver provision either meaningless or ineffectual.

First, if only the pervasiveness of section 207's regulation of in-use performance is sufficient to restrict the Administrator's waiver authority, there is no reason why on the same reasoning a comparable limitation could not be found in section 202's pervasive regulation of national motor vehicle emission standards or section 206's pervasive regulation of the federal certification process. Sections 202, 206 and 207 are all integral parts of a comprehensive federal program; all three are equally treated in section 209(a). Yet were the Administrator to regard sections 202 and 206 as petitioners urge him to regard section 207, he would be powerless to consider waiving federal preemption for California's emission standards and certification process. This lack of power would render the waiver provision—and indeed, the express preemption provision—mere surplusage.[20]

**20.** Petitioners' argument about section 207 circumscribing the waiver power avoids, as noted, any direct suggestion that section 207 alone achieves an implied preemption of the in-use maintenance regulations. The argument, however, can fairly be characterized as an implied preemption claim in masquerade, and indeed the Administrator and the State of California understandably interpreted it as such in their submissions to this court. *See* Br. for Respondents at 29–32; Br. for Intervenors at 25–34. The obstacles facing a straightforward implied preemption claim are formidable. First, there being an express preemption provision that clearly covers the challenged regulations, no need exists to turn to a theory of implication. *Cf. City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 633, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1977) (examining implied preemption only after noting absence of express provision). Second, the burden of demonstrating preclusion of state regulation by implication from federal regulation is a heavy one, *see Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146–47, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), and cannot be met by a mere showing of "the comprehensive character" of the

It is axiomatic that a statute must be construed to avoid that result so that no provision will be inoperative or superfluous. *See United States v. Menasche*, 348 U.S. 528, 75 S.Ct. 513, 99 L.Ed. 615 (1955).

■ Second, if instead petitioners divine the limit on the waiver authority from section 207's particular area of regulation—in-use performance—then their argument is that Congress did not intend California to have any interests in emissions control once new motor vehicles leave the assembly line. Certainly section 209 makes no distinction among different types of in-use performance regulation which operate as enforcement procedures and conditions precedent.[21] Thus on petitioners' reading the statute permits California to establish emission standards and certification procedures, but forbids it from ensuring that the standards are effective once the motor vehicle leaves the showroom. Yet the only time that a new motor vehicle is capable of polluting the environment is when it is out on the road. The purpose of the Clean Air Act is to reach precisely that kind of pollution. Our duty is to "favor an interpretation which would render the statutory design effective in terms of the policies behind its enactment and to avoid an interpretation

which would make such policies more difficult of fulfillment, particularly where, as here, that interpretation is consistent with the plain language of the statute." *National Petroleum Refiners Association v. FTC*, 157 U.S.App.D.C. 83, 100, 482 F.2d 672, 689 (1973), *cert. denied*, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974).

■ The legislative history of section 209 supports the Administrator's interpretation that the waiver provision is coextensive with the preemption provision, thereby permitting the Administrator to consider waiving preemption of California's entire program of emissions control.[22] No federal statute purported to regulate emissions from motor vehicles until 1965, when Congress enacted the Motor Vehicle Air Pollution Control Act, section 202 of which authorized the Secretary of Health, Education, and Welfare to prescribe emission standards.[23] Although signs appear in the legislative history that this enactment was intended to enhance uniformity in national efforts at pollution control,[24] the statute contained no express preemption provision. Consequently states generally felt free to adopt regulations in the field, and several states followed up the federal statute with regulatory schemes of their own.[25]

---

federal scheme, *see New York Dept. of Social Services v. Dublino*, 413 U.S. 405, 415, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973). Third, that burden is rendered ever more difficult here because section 116 of the Clean Air Act lists those provisions of the statute which Congress intended to reserve for exclusive federal regulation, and section 207 is not among them. 42 U.S.C. § 7416 (Supp. I 1977).

Section 116 is not germane to our inquiry because it does list section 209 among those provisions preempting state regulation. The cases on implied preemption are relevant only in bolstering our conclusion that subsection (b) contains no implied restrictions on the Administrator's power to consider waiver requests.

**21.** *See* note 19 *supra.*

**22.** Petitioners complain that the Administrator cites no legislative history to support his use of the waiver power to permit the California in-use maintenance regulation. It is, however, the *petitioners* who bear the burden of demonstrating that the Administrator's interpretation of section 209 is unreasonable. It is true that the legislative history of the waiver provision con-

tains no direct reference to the issue of waiving in-use maintenance regulations, but legislative history is not required to cover every aspect of a statute's application. As we show, there are overwhelming indications in the legislative history that Congress intended California to enjoy the broadest possible discretion in selecting a complete program of emissions control, and not the slightest indication that it intended section 207 to qualify that discretion.

**23.** Pub.L. No. 89–272, § 202, 79 Stat. 992 (1965).

**24.** *See, e. g.*, S.Rep. No. 192, 89th Cong., 1st Sess. 5–8 (1965); H.R.Rep. No. 899, 89th Cong., 1st Sess. 5 (1965), U.S.Code Cong. & Admin. News 1965, p. 3608; *Hearings on H.R. 463 Before the Subcomm. on Public Health & Welfare of the House Comm. on Interstate & Foreign Commerce*, 89th Cong., 1st Sess. 281 (1965) (statement of Mr. Barr).

**25.** *See generally* Currie, *Motor Vehicle Air Pollution: State Authority and Federal Preemption*, 68 Mich.L.Rev. 661, 674 (1971). As Pro-

The states acting after 1965 were Johnnies-come-lately to the field compared to California, which had undertaken statewide efforts as early as 1958.[26] Congress' entry into the field and the heightened state activity after 1965 raised the spectre of an anarchic patchwork of federal and state regulatory programs, a prospect which threatened to create nightmares for the manufacturers.[27] Acting on this concern, Congress in 1967 expressed its intent to occupy the regulatory role over emissions control to the exclusion of all the states— all, that is, except California.

As originally introduced in the Senate the Air Quality Act of 1967 did not contain an express preemption provision,[28] though the topic of preemption quickly arose and immediately became the object of intense debate.[29] The debate sharpened the differences between the states, which wanted to preserve their traditional role in regulating motor vehicles, and the manufacturers, which wanted to avoid the economic disruption latent in having to meet fifty-one separate sets of emissions control requirements. The bill that emerged from the Senate Committee contained a compromise: Subsection (a) preempted state programs of emissions control for new motor vehicles; subsection (b) provided an exception for California if that State determined that its standards would be "more stringent" than applicable federal standards.[30] The Senate Committee explained:

On the question of preemption, representatives of the State of California were clearly opposed to displacing the State's right to set more stringent standards to meet peculiar local conditions. The auto industry conversely was adamant that the nature of their manufacturing mechanism required a single national standard in order to eliminate undue economic strain on the industry.

The committee has taken cognizance of both of these points of view. Senator Murphy convinced the committee that California's unique problems and pioneering efforts justified *a waiver of the preemption section* to the State of California.

S.Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) (emphasis added).

Thus the Committee that formulated the waiver provision understood the costs involved in making an exception for California and decided to recommend that these costs be absorbed by allowing a waiver not of *part* of the preemption provision, but of the entire subsection (a). According to the Committee, the advantages of the California exception included the benefits for the

fessor Currie notes, these efforts were partly encouraged by the Supreme Court's decision in *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960), which rejected an implied preemption claim based on federal regulation of air pollution.

**26.** California's interest in pollution control from motor vehicles dates to 1946. Stevens, *Air Pollution and the Federal System: Responses to Felt Necessities*, 22 Hastings L.J. 661, 674 (1971). Comprehensive statewide efforts began in 1957, when the State granted county air pollution control boards the authority to prescribe standards for emission control devices and to prohibit the sale of unapproved devices. 1957 Cal.Stats., chap. 239, § 1 (former Cal. Health & Safety Code § 24263.7). This was followed by the authorization for the establishment of statewide standards, 1959 Cal. Stats., chap. 200 (former Cal. Health & Safety Code § 426.5), and a certification procedure, 1960 Cal.Stats., chap. 23, § 1 (former Cal. Health & Safety Code § 24386). The Senate Report on the Motor Vehicle Air Pollution Control Act observed that California "leads in the establishment of standards for regulation of automotive pollutant emissions." S.Rep. No. 192, 89th Cong., 1st Sess. 5 (1965).

**27.** This prospect never materialized. The federal government did not make its first standards applicable until the 1968 model year. 45 C.F.R. § 85.1–.87 (1967). By that time, Congress had already enacted the express preemption provision.

**28.** *See Hearings on Automotive Air Pollution Before the Subcomm. on Air and Water Pollution of the Senate Comm. on Public Works*, 90th Cong., 1st Sess. 8 (1967).

**29.** *Id.* at 13–14 (statement of W. Donn); *id.* at 107 (statement of D. Coston); *id.* at 403 (statement of T. Mann).

**30.** *S.Rep. No. 403, 90th Cong., 1st Sess.* 81 (1967).

Nation to be derived from permitting California to continue its experiments in the field of emissions control—benefits the Committee recognized might "require new control systems and design," *id.*—and the benefits for the people of California to be derived from letting that State improve on "its already excellent *program* " of emissions control, *id.* (emphasis added). There is no intimation in the Senate Committee report that the waiver provision was designed to permit California to adopt only a portion of such a program. The House accepted the Senate version.[31]

Congress had an opportunity to restrict the waiver provision in making the 1977 amendments, and it instead elected to expand California's flexibility to adopt a complete program of motor vehicle emissions control. Under the 1977 amendments, California need only determine that its standards will be "in the aggregate, at least as protective of public health and welfare than applicable Federal standards," rather than the "more stringent" standard contained in the 1967 Act.[32] This change originated in

the House. The House Committee Report explained:

> The Committee amendment is intended *to ratify and strengthen* the California waiver provision and to affirm the underlying intent of that provision, i. e., *to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare.*

H.R.Rep. No. 294, 95th Cong., 1st Sess. 301–02 (1977), U.S.Code Cong. & Admin.News 1977, p. 1380 (emphasis added). This language appears in the same House Report that elaborately describes section 207's regulatory format. The Report is barren of an indication that Congress intended to confine California's discretion to the adoption of emission standards, certification processes, and test procedures.[33]

Since the inception of the federal government's emissions control program it has drawn heavily on the California experience to fashion and to improve the national efforts at emissions control.[34] The history of

---

**31.** Not without a fight. *See* text accompanying note 51 *infra.* The battle over the waiver provision in the House did not turn on the scope of the waiver power, however, and the debate on the floor of the House indicates that the members shared the Senate's conviction that the waiver provision was intended to permit California to adopt an entire program of emissions control. *See, e. g.,* 113 Cong.Rec. 30950 (1967) (remarks of Rep. Springer); *id.* at 30948 (remarks of Rep. Staggers).

When the Senate considered the conference version of the Air Quality Act of 1967, only one comment was directed at the waiver provision, and this by its original sponsor:

> It was concern for allowing California to continue its pioneering efforts in the field of air pollution that led to the amendment [on waiver]. . . .
>
> . . . I am firmly convinced that the United States as a whole will benefit by allowing California to continue setting its own more advanced standards for control of motor vehicle emissions. In a sense, our State will act as a testing agent for various types of controls and the country as a whole will be the beneficiary of this research. . . . Our State intends to continue its efforts to eliminate air pollution without letup and asks only that no roadblocks be put in its path.

*Id.* at 32478 (remarks of Sen. Murphy).

**32.** Clean Air Act Amendments of 1977, Pub.L. No. 95–95, § 207, 91 Stat. 755. The intent of the 1977 amendment was to accommodate California's particular concern with oxides of nitrogen, which the State regards as a more serious threat to public health and welfare than carbon monoxide. California was eager to establish oxides of nitrogen standards considerably higher than applicable federal standards, but technological developments posed the possibility that emission control devices could not be constructed to meet both the high California oxides of nitrogen standard and the high federal carbon monoxide standard. Under the 1967 waiver provision, each California standard had to be "more stringent" than the corresponding federal standard. Hence Congress amended the waiver provision to require only that the California standards in the aggregate were at least as protective of public health and welfare as applicable federal standards. This permits the State to maintain a high standard for oxides of nitrogen but a standard for carbon monoxide somewhat lower than the federal standard.

**33.** *See* note 19 *supra.*

**34.** The first federal emission standards were largely borrowed from California, for example. *See* S.Rep. No. 403, 90th Cong., 1st Sess. 32 (1967); Willens, *The Regulation of Motor Vehicle Emissions,* 3 Nat.Res.Lawyer 120, 123–24

congressional consideration of the California waiver provision, from its original enactment up through 1977, indicates that Congress intended the State to continue and expand its pioneering efforts at adopting and enforcing motor vehicle emission standards different from and in large measure more advanced than the corresponding federal program; in short, to act as a kind of laboratory for innovation. Had Congress wanted to limit California's role to forbid its adoption of any program comparable to the federal scheme in section 207, it could have easily done so. It did not. For a court to do so despite the absence of such an indication would only frustrate the congressional intent.

We therefore are unable to find compelling indications in the text of the statute, in its legislative history, or in its underlying intent that the Administrator's interpretation of the waiver provision is wrong. We accordingly hold that section 209(b) empowers the Administrator to consider a waiver request for in-use maintenance regulations.

## IV

### WAIVER CONSIDERATIONS

The second question for decision requires us to determine the substantive matters the Administrator must address in considering a request for a waiver of in-use maintenance regulations. It is the petitioners' view that the Administrator neglected to address certain statutorily-prescribed matters, and, in addition, that he improperly declined to examine the constitutional and antitrust implications of the in-use maintenance regulations. The Administrator contends that he addressed all questions the statute requires him to address, and that the constitutional and antitrust implications of the CARB regulations are beyond the scope of his review in a waiver proceeding. We essentially agree with the Administrator's position.

(1970). The 1977 standards also drew heavily on the California experience in the ten years since enactment of the first waiver provision.

### A. Section 209(b) Considerations

As noted, subsection (b) requires the Administrator to waive application of subsection (a) if California determines that its standards are at least as protective of the public health and welfare as applicable federal standards. A grant of the waiver is not necessarily automatic, however. Subsection (b) says that the Administrator shall not grant the waiver request if he finds (1) that California's determination of protectiveness was arbitrary and capricious; (2) that California does not need the standards to meet compelling and extraordinary circumstances; and (3) that the standards and accompanying enforcement procedures are inconsistent with section 202(a) of the Clean Air Act, which as indicated requires the Administrator's standards to be technologically feasible.

The parties agree that if the Administrator makes any one of these findings with respect to a waiver request involving California "standards" he must deny the request. In his waiver decision, however, the Administrator characterized the in-use maintenance regulations as "accompanying enforcement procedures" rather than as "standards." According to him, the word "standards" connotes a numerical value setting the quantitative level of permitted emissions of pollutants by a new motor vehicle. Thus for example a regulation limiting motor vehicle emissions of carbon monoxide to 3.4 grams per mile is in his view a "standard."

The Administrator says that "accompanying enforcement procedures," on the other hand, are criteria designed to determine compliance with applicable standards, and that the in-use maintenance regulations, being relevant to the manufacturers' ability to produce motor vehicles which will comply with the standards for their useful life, are properly classified as enforcement measures. The Administrator notes that section 209(b) refers to accompanying enforcement procedures only in the context of consisten-

See 123 Cong.Rec. H4852 (daily ed. May 21, 1977); id. at H5061 (daily ed. May 25, 1977).

cy with section 202(a). On this basis he concludes that in a waiver proceeding involving enforcement procedures tied to standards for which a waiver has already been granted the only questions he must address are (1) whether the enforcement procedures are so lax that they threaten the validity of California's determination that its *standards* are as protective of public health and welfare as applicable federal standards and (2) whether the enforcement procedures are consistent with section 202(a).

Petitioners insist that the in-use maintenance regulations are "standards." They say that a "standard" refers to any criterion with which the manufacturers must comply. Alternatively, they contend that however the in-use maintenance regulations are labeled, the Administrator must address each of the three statutory questions in every waiver proceeding. Thus they believe that the Administrator must deny the waiver if he finds that California acted unreasonably in concluding that the in-use maintenance regulations were as protective of the public health and welfare as federal regulations, or that the in-use maintenance regulations are not needed to meet compelling and extraordinary local conditions.

■ We need not resolve here the meaning of the word "standards" as it is used in every section of the Clean Air Act; our inquiry is confined to its use in section 209.[35] In that setting we believe that the Administrator correctly classified the in-use maintenance regulations as "accompanying enforcement procedures" rather than as "standards."

Petitioners' definition would eliminate the concept of enforcement regulations as something distinct from a standard. Congress, however, clearly intended to make such a distinction in section 209. As noted, subsection (b) refers to "standards" *and* to "accompanying enforcement procedures." Subsection (a) provides that no state shall "adopt *or attempt to enforce* standards." These references to efforts at enforcement would have been unnecessary if Congress intended that "standards" meant any regulation relating to motor vehicle emissions control.

The legislative history also indicates that Congress intended the word "standards" in section 209 to mean quantitative levels of emissions rather than regulations involving certification or in-use maintenance restrictions. The Senate Report on the Air Quality Act of 1967, discussing the preemption provision, mentions "standards" for hydrocarbons, nitrogen oxides, and carbon monoxide in obvious reference to the numerical limitations on those pollutants. S.Rep. No. 403, 90th Cong., 1st Sess. 32 (1967). In describing the changes made in the waiver provision in 1977, the House Report explains why different quantitative "standards" might be necessary for California. H.R.Rep. No. 294, 95th Cong., 1st Sess. 302 (1977). This same report refers to the Administrator's power to review California's protectiveness determination, a determination which under the statute pertains to "standards," as limited to determining whether "the State acted unreasonably in evaluating the relative risks of various pollutants in light of air quality, topography, photochemistry and climate in that State." *Id.* Numerical values on allowable emis-

35. For this reason we find unpersuasive petitioners' suggestion that section 302(k) of the Clean Air Act, 42 U.S.C. § 7602(k) (Supp. I 1977), which contains a definition of "emission standards," controls our examination of the meaning of the word "standards" in section 209. Section 302(k)'s definition was not enacted until ten years after the original waiver provision, and it was developed in the context of regulating emissions from stationary sources. The Conference Report on the 1977 amendments, which explained many of the differences between the Senate and House ver-

sions of the 1977 bill, strongly intimates that the definition applies only in the stationary source context. *See* H.R.Rep. No. 564, 95th Cong., 1st Sess. 172 (1977), U.S.Code Cong. & Admin.News 1977, p. 1077 (Conference Report). Moreover, as we explain, classifying the in-use maintenance regulations as "standards" would make it virtually impossible for California to enact such regulations, and this in turn would frustrate Congress' intent to provide California with the broadest possible discretion in selecting the best means for protecting the public health and welfare.

sions allocate the relative risks of pollutants; regulations on allowable maintenance do not.

The Administrator has consistently made a distinction between standards and accompanying enforcement procedures, confining the former to regulations on quantitative levels of emissions.[36] In construing the word "standards" in another section of the Clean Air Act, the Supreme Court defined the term as "a quantitative 'level' to be attained by the use of 'techniques,' 'controls,' and 'technology.'" *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 286, 98 S.Ct. 566, 573, 54 L.Ed.2d 538 (1978). In light of these considerations, we cannot conclude that the Administrator's definition is unreasonable.

We also agree with the Administrator that the distinction between standards and accompanying enforcement procedures is a meaningful one in a waiver proceeding, at least when the latter relate to standards for which a waiver has already been granted. The statute itself only refers to enforcement procedures in connection with the consistency finding. Congress was certainly capable of adding the phrase "accompanying enforcement procedures" wherever the word "standards" appeared if it desired the statutory findings to apply to both. We see no reason to assume that its failure to do so is attributable to sloppy draftmanship, particularly in light of indications in the legislative history that the failure was a deliberate one.[37]

Moreover, the differing treatment accorded standards and enforcement procedures in subsection (b) makes sense, and is consistent with the congressional intent to provide California with the broadest possible discretion in adopting and attempting to enforce emissions standards. The protectiveness determination California must make to request a waiver and the need finding the Administrator must make to deny one are both logically tied to air quality—that is, to conditions in the air which require the regulation of emissions in the first instance. These considerations are prerequisites to California's establishment of its own program of emissions control. The only species of emissions control regulation which directly addresses air quality is a standard. Only a standard describes pollutants and allocates the various risks thereof.

An enforcement procedure, by contrast, does not directly relate to air quality. A certification process without standards cannot protect public health; a particular spark plug change can never be justified by conditions in the environment it does not alone directly affect. If the Administrator was entitled to deny a waiver upon a finding that California did not need a particular enforcement procedure to meet compelling and extraordinary conditions in California, it is unlikely that a contested waiver request would ever be granted. Of course, the absence or ineffectiveness of an enforcement program might endanger the ability of the standards to accomplish the levels of emissions they seek, and thus an indirect relationship exists between enforcement procedures and the public health and welfare. Yet the relationship turns on the impact of the enforcement procedures on the effectiveness of the standards. Similarly, the imposition of enforcement proce-

---

**36.** *Petitioners claim otherwise, contending that the Administrator in fact considered whether the in-use maintenance regulations were as protective of public health and welfare as applicable federal standards, an inquiry inappropriate under the Administrator's analysis here. Petitioners misinterpret what the Administrator did, however. He did* not *examine whether the in-use maintenance regulations were themselves as protective of public health and welfare as applicable federal standards. Rather he explored whether the procedures had a negative effect on the protectiveness of the Califor-* nia standards for which a 'waiver had already been granted. See *43 Fed.Reg. 32183 (1978),* reprinted in *J.A. at 56. This inquiry is perfectly consistent with the Administrator's past practice and his position in this court.*

**37.** *The Senate Report on the original waiver provision, for example, explained that the only ground on which a waiver for accompanying enforcement procedures could be denied was if the procedures "are in conflict with the intent of Section 202(a)." S.Rep. No. 403, 90th Cong., 1st Sess. 33–34 (1967).*

dures that cannot be met in light of technological developments affects the manufacturers' ability to certify motor vehicles that will control pollution for their useful lives. It is therefore logical to condition California's flexibility to adopt enforcement procedures on the manufacturers' capacity to comply with the regulations the State prescribes.

 The Administrator has consistently treated standards differently than enforcement procedures in waiver proceedings, and his decision to do so here thus comes as no surprise.[38] This differing treatment antedated the 1977 amendments, and it is noteworthy that Congress expressed general approval of the Administrator's subsection (b) decisions in revising the waiver power.[39] In light of these factors, we are unable to conclude that the Administrator acted unreasonably in limiting the considerations he must address. We accordingly hold that when considering a request for waiver of in-use maintenance regulations pertaining to standards for which a waiver has already been granted the Administrator is not required to consider whether California reasonably determined that the regulations themselves are as protective of public health and welfare as applicable federal standards or whether the regulations themselves are needed to meet compelling and extraordinary conditions in California. His failure to consider the factors here, therefore, is no basis for setting aside his decision.[40]

### B. Constitutional Considerations

Petitioners complain that the in-use maintenance regulations unconstitutionally burden their right to communicate with vehicle purchasers. They also maintain that the regulations alter statutory defenses and impose liability on manufacturers without fault in violation of the due process clause. We address the substance of these arguments at a later point, see Part VIII infra, and for now are concerned only with petitioners' contention that the Administrator had an obligation to consider these contentions in considering whether to grant the waiver.

It is petitioners' position that the general principles of administrative law and procedure obligate the Administrator to obey the Constitution and to be mindful of constitutional goals. According to petitioners, these obligations require the Administrator to pass on constitutionally-based challenges to the CARB regulations in deciding whether to waive federal preemption for them. As noted, the Administrator regards these constitutional issues as beyond the scope of his review.

 We think the Administrator was entitled to refuse to pass on petitioners' constitutional claims.[41] That he like every other administrative officer owes allegiance to the Constitution does not mean that he is

---

**38.** See, e. g., 43 Fed.Reg. 9344, 9345 (1978); 42 Fed.Reg. 3192, 3194 (1977); 41 Fed.Reg. 44209 (1977); 36 Fed.Reg. 17458 (1971).

**39.** H.R.Rep. No. 294, 95th Cong., 1st Sess. 301 (1977).

**40.** Petitioners suggest that the Administrator was obligated to conduct a cost-effectiveness study on the in-use maintenance regulations as part of his examination of the "cost of compliance." We disagree. As we note below, the "cost of compliance" consideration relates to the timing of standards and procedures. Here the Administrator noted on the record that the manufacturers did not challenge "[t]he CARB estimat[e] that the regulations would . . . resul[t] in a net cost benefit." 43 Fed.Reg. 32184 (1978), reprinted in J.A. at 57. This is sufficient for the "cost of compliance" inquiry. In Portland Cement Co. v. Ruckleshaus, 158

U.S.App.D.C. 308, 327, 486 F.2d 375, 387 (1973), cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974), we rejected the cost-effectiveness requirement with these words:

> However desirable in the abstract, such a [study] requirement would conflict with the specific time constraints imposed on the Administrator. The difficulty, if not the impossibility, of quantifying the benefit of ambient air conditions, further militates against the imposition of such an imperative on the agency.

This reasoning applies here as well.

**41.** We need not decide here whether the Administrator is authorized to deny a waiver on the ground that the proposed California regulations are on their face violative of the Constitution.

required to issue rulings of constitutional dimension. Resolving questions of constitutional scope is the most important of judicial functions, "one that even the judiciary is reluctant to exercise." *Panitz v. District of Columbia*, 72 App.D.C. 131, 133, 112 F.2d 39, 41 (1940). Here the Administrator operates in a narrowly circumscribed proceeding requiring no broad policy judgments on constitutionally sensitive matters. Nothing in section 209 requires him to consider the constitutional ramifications of the regulations for which California requests a waiver. *Cf.* 47 U.S.C. § 326 (1976) ("no regulation or condition shall be promulgated or fixed by the [Federal Communications] Commission which shall interfere with the right of free speech"). Nor need he as an incident to his regulatory authority determine the constitutional applicability of the in-use regulations to particular individuals or circumstances. *Compare Eisen v. Eastman*, 421 F.2d 560 (2d Cir. 1969), *cert. denied*, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 75 (1970) *with Plano v. Baker*, 504 F.2d 595 (2d Cir. 1974).

 It is generally considered that the constitutionality of Congressional enactments is beyond the jurisdiction of administrative agencies. *Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Johnson v. Robison*, 415 U.S. 361, 368, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); L. Jaffe, *Judicial Control of Administrative Action* 438 (ab. ed. 1965). Although petitioners' objections are not directed at the

Clean Air Act,[42] the rationale underlying the cases dealing with administrative power to consider challenges to statutes is useful in this context as well. The waiver proceeding produces a forum ill-suited to the resolution of constitutional claims. While nothing in section 209 categorically forbids the Administrator from listening to constitutionally-based challenges, petitioners are assured through a petition for review here that their contentions will get a hearing. Exhaustion of constitutional claims may on occasion be required by statute, *see Weinberger v. Salfi, supra,* or by principles of administrative procedure if there is a possibility that the agency will decide in the litigant's favor on *non* constitutional grounds, *see Public Utilities Commission v. United States*, 355 U.S. 534, 539–40, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958). But when, as here, petitioners have exhausted their administrative remedies, a failure to have raised the constitutional claims before the Administrator would not bar them from asserting the claims to this court.

 We conclude that it was not error for the Administrator to decline to examine petitioners' constitutional arguments against the in-use maintenance regulations.[43]

### C. Antitrust Considerations

Petitioners [44] insist that the in-use maintenance regulations are anticompetitive because they are designed to reduce the business available to the automotive parts and

---

42. This is only partly true. As noted, section 207 gives the Administrator the power to issue regulations governing in-use maintenance. 42 U.S.C. § 7541(c) (Supp. I 1977). The Administrator has not promulgated such regulations, and hence any constitutionally-based attack on section 207 and its offspring would be premature. Yet were the Administrator to pass on the constitutionality of the CARB's in-use maintenance regulations, he would necessarily be passing on the constitutionality of the power Congress delegated to him in section 207. Thus if the Administrator accepted petitioners' invitation, he would be indirectly violating the *principle that administrative agencies generally have no jurisdiction to consider the constitutionality of their organic statutes, supra.*

43. Petitioners additionally complain that the Administrator did not provide a "meaningful explanation" of his reasons for not passing on the constitutionally-based claims. This claim is makeweight. The Administrator stated that the constitutional arguments "are beyond the scope of my review, and the waiver hearing is not a proper forum in which to raise them." 43 Fed.Reg. 32185 (1978), *reprinted in* J.A. at 58 (citation omitted). Although succinct, this statement certainly communicates the basis for the Administrator's decision. *See Belco Petroleum Corp. v. FERC*, 191 U.S.App.D.C. 157, 163, 589 F.2d 680, 686 n. 6 (1978). He was not required to insert an elaborate legal brief defending his position into the waiver decision.

44. *See* note 2 *supra.*

services industry and because they allegedly create a financial and psychological tie-in (via the warranty provisions) between vehicle purchasers and franchised dealerships in the performance of in-use maintenance. They contend that the Administrator has a duty arising out of the Clean Air Act and general principles of administrative law to consider these claims of anticompetitiveness, and that his decision is unlawful owing to his failure to abide by that duty. As noted, the Administrator held that the antitrust implications of the in-use maintenance regulations were beyond the scope of his review. He did note, however, that the regulations were consistent with section 207, which contains expressions of congressional concern about certain potentially anticompetitive practices.[45]

Although we think the Administrator must be sensitive to section 207 concerns in approaching a waiver decision, we agree that he has no duty beyond that to consider claims of anticompetitiveness in a waiver proceeding. We base our agreement on three grounds.

First, there is no such thing as a "general duty" on an administrative agency to make decisions based on factors other than those Congress expressly or impliedly intended the agency to consider. The general principles of administrative law and procedure call upon an agency to give reasoned consideration to all facts and issues relevant to the matter at hand, but the determination of what is relevant turns in the first instance on analysis of the express language of the statute involved and the content given that language by implication from the structure of the statute, its legislative history, and the general course of administrative practice since its enactment. An administrative agency has no charter apart from the framework constructed by that analysis to enforce or otherwise consider whatever suits its or someone else's fancy. *See generally International Brotherhood of Teamsters v. Daniel, supra.*

Second, there is no express provision in section 209 or elsewhere in the Clean Air Act requiring the Administrator to assess general claims of anticompetitiveness in his consideration of waiver requests. Section 209 nowhere explicitly refers to anticompetitiveness concerns. Elsewhere in the statute, section 317, 42 U.S.C. § 7617 (Supp. I 1977), requires the Administrator to prepare an economic impact statement investigating anticompetitive concerns before taking certain prescribed actions, but a section 209 waiver is not included among these actions.[46] Even if it were, section 317 pro-

---

**45.** 43 Fed.Reg. 32184 (1978), *reprinted in* J.A. at 57–58. The strongest expression of the Administrator's concern appears in his letter denying a request for reconsideration of another waiver decision. This letter is part of the record in these cases. Letter from Douglas Costle to Mark Joelson (November 1, 1978), *reprinted in* J.A. at 1853–55.

**46.** Section 317 provides in pertinent part:

Notice of proposed rulemaking; substantial revisions

(a) This section applies to action of the Administrator in promulgating or revising—

(1) any new source standard of performance under section 7411 of this title,

(2) any regulation under section 7411(d) of this title,

(3) any regulation under part B of subchapter I of this chapter (relating to ozone and stratosphere protection),

(4) any regulation under part C of subchapter I of this chapter (relating to prevention of significant deterioration of air quality),

(5) any regulation establishing emission standards under section 7521 of this title and any other regulation promulgated under that section,

(6) any regulation controlling or prohibiting any fuel or fuel additive under section 7545(c) of this title, and

(7) any aircraft emission standard under section 7571 of this title.

Nothing in this section shall apply to any standard or regulation described in paragraphs (1) through (7) of this subsection unless the notice of proposed rulemaking in connection with such standard or regulation is published in the Federal Register after the date ninety days after August 7, 1977. In the case of revisions of such standards or regulations, this section shall apply only to revisions which the Administrator determines to be substantial revisions.

Preparation of assessment by Administrator

(b) Before publication of notice of proposed rulemaking with respect to any standard or regulation to which this section applies, the Administrator shall prepare an eco-

vides that nothing therein shall be construed to alter the basis on which any regulation is promulgated, to preclude the Administrator from carrying out his responsibilities to protect the public health and welfare, or to authorize a court to set aside an action of the Administrator on the ground that he failed to assess the economic impact of the action. *Id.* § 7617(e). This last particularly signifies Congress' intent that the Administrator's decisions on air quality standards and related matters be immune from attacks like the one at bar.

■ Third, nothing in section 209 or elsewhere in the Clean Air Act can fairly be read to imply a duty on the Administrator to deny a waiver on the basis of the antitrust implications of California regulations. Petitioners profess to find such a duty in the "public health and welfare" language of sections 209 and 202(a) and in section 202's requirement that the Administrator give

appropriate consideration to the "cost of compliance" with the standards. The "public health" provision, they insist, imposes a duty comparable to that found in other administrative statutes that require agencies to take account of the "public interest" in making decisions. The "cost of compliance" provision, they say, compels appropriate consideration of the "social costs" of pollution control. We think these contentions stretch the effective scope of those provisions well beyond their reasonably inferrable reach.

■ As our earlier discussion of the content of the word "standards" in section 209 intimated, the phrase "public health and welfare" is directly related to the effects of pollution on the environment. Congress enacted the Clean Air Act as an attempt to improve the quality of the air. This concern with pollution was not confined to its

nomic impact assessment respecting such standard or regulation. Such assessment shall be included in the docket required under section 7607(d)(2) of this title and shall be available to the public as provided in section 7607(d)(4) of this title. Notice of proposed rulemaking shall include notice of such availability together with an explanation of the extent and manner in which the Administrator has considered the analysis contained in such economic impact assessment in proposing the action. The Administrator shall also provide such an explanation in his notice of promulgation of any regulation or standard referred to in subsection (a) of this section. Each such explanation shall be part of the statements of basis and purpose required under sections 7607(d)(3) and 7607(d)(6) of this title.

Analysis
(c) Subject to subsection (d) of this section, the assessment required under this section with respect to any standard or regulation shall contain an analysis of—
(1) the costs of compliance with any such standard or regulation, including extent to which the costs of compliance will vary depending on (A) the effective date of the standard or regulation, and (B) the development of less expensive, more efficient means or methods of compliance with the standard or regulation;
(2) the potential inflationary or recessionary effects of the standard or regulation;
(3) the effects on competition of the standard or regulation with respect to small business;

(4) the effects of the standard or regulation on consumer costs; and
(5) the effects of the standard or regulation on energy use.
Nothing in this section shall be construed to provide that the analysis of the factors specified in this subsection affects or alters the factors which the Administrator is required to consider in taking any action referred to in subsection (a) of this section.
Extensiveness of assessment
(d) The assessment required under this section shall be as extensive as practicable, in the judgment of the Administrator taking into account the time and resources available to the Environmental Protection Agency and other duties and authorities which the Administrator is required to carry out under this chapter.
Limitations on construction of section
(e) Nothing in this section shall be construed—
(1) to alter the basis on which a standard or regulation is promulgated under this chapter;
(2) to preclude the Administrator from carrying out his responsibility under this chapter to protect public health and welfare; or
(3) to authorize or require any judicial review of any such standard or regulation, or any stay or injunction of the proposal, promulgation, or effectiveness of such standard or regulation on the basis of failure to comply with this section.
42 U.S.C. § 7617 (Supp. I 1977).

adverse effects on humans, but extended as well to its impact on the economy.[47] The terms "public health and welfare" thus encompass economic values, but only to reflect the economic costs of pollution, not the social costs of pollution control. This is evident in every context in which the terms appear. *See, e. g.,* 42 U.S.C. § 7521(a) (Supp. I 1977); *id.* § 7543(b); *id.* § 7409(b)(2); *id.* § 7571(a)(2); *id.* § 7401; *id.* § 7403(f); *id.* § 7405(a); *id.* § 7408(a); *id.* § 7450. When Congress intended the Administrator to go beyond the effects of pollution and examine as well the effects of pollution control it made its intent apparent. This is strikingly evident in section 317, which carefully distinguishes between protection of the public health and welfare and concern with anticompetitiveness. *See id.* § 7617(e).

■ Similarly, there is no indication that Congress intended section 202's "cost of compliance" consideration to embody "social costs" of the type petitioners advance. Every effort at pollution control exacts social costs. Congress, not the Administrator, made the decision to accept those costs. Section 202's "cost of compliance" concern, juxtaposed as it is with the requirement that the Administrator provide the requisite lead time to allow technological developments, refers to the economic costs of motor vehicle emission standards and accompanying enforcement procedures. *See* S. Rep. No. 192, 89th Cong., 1st Sess. 5–8 (1965); H.R. Rep. No. 728, 90th Cong., 1st Sess. 23 (1967), U.S. Code Cong. & Admin.News 1967, p. 1938. It relates to the *timing* of a particular emission control regulation rather than to its social implications. Congress wanted to avoid undue economic disruption in the automotive manufacturing industry and also sought to avoid doubling or tripling the cost of motor vehicles to purchasers. It therefore requires that emission regulations be technologically feasible within economic parameters. Therein lies the intent of the "cost of compliance" requirement.

The cases petitioners cite in which the Supreme Court has imposed a duty to consider anticompetitive effects under general statutory directives to protect the "public interest" are inapposite here. Indeed they confirm our view that the general terms of a statute derive their content from the context in which the terms appear.

The Supreme Court's decision in *Gulf States Utilities Co. v. Federal Power Commission,* 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973), is instructive. That case involved section 204 of the Federal Power Act, which provides that no public utility shall issue a security "unless and until, and then only to the extent that" the Federal Power Commission approved. 16 U.S.C. § 824c(a).[48] The Commission is authorized to approve an issue "*only* 'if it finds that such issue . . . is for some lawful object, within the corporate purposes of the applicant and compatible with the public interest.'" 411 U.S. at 756, 93 S.Ct. at 1876 (quoting 16 U.S.C. § 824c(a)) (emphasis in original). Stressing this language, the Supreme Court rejected the Commission's view that it need not consider anticompetitive implications. The Federal Power Act, the Court explained, "was passed in the context of, and in response to, great concentrations of economic and even political power vested in public trusts, and the absence of antitrust enforcement to re-

---

**47.** The House Report on the 1977 amendments noted:

> The committee recognizes that air pollution causes significant economic costs to the public by damaging health and welfare. Such costs include an increased incidence of illness, premature death, increased expenditures for health care and insurance and loss of tax revenues. Additionally, it causes damage to real estate and crops (and other vegetation), and could result in huge economic losses for tourist-related industries. While quantifications of these losses is obviously difficult, some estimates range as high as $16.1 billion annually (in 1968 dollars).

H.R.Rep. No. 294, 95th Cong., 1st Sess. 34 (1977), U.S. Code Cong. & Admin. News 1977, p. 1112.

**48.** The Federal Power Commission is no longer in existence. Its responsibilities have been transferred to the Secretary of Energy, 42 U.S.C. § 7151 (Supp. I 1977), and the Federal Energy Regulatory Commission, *id.* § 7172.

strain the growth and practices of public utility holding companies." *Id.* at 758, 93 S.Ct. at 1877. The Commission's power was correspondingly "broad and impressive" and was intended to "curb abusive practices" and to "provide effective federal regulation of the expanding business" of selling electric power. *Id.* at 756, 758, 93 S.Ct. at 1877.

Likewise, in *Federal Maritime Commission v. Aktiebolaget Svenska Amerika Linien,* 390 U.S. 238, 88 S.Ct. 1005, 19 L.Ed.2d 1071 (1968), another case on which petitioners chiefly rely, the Supreme Court approved the Federal Maritime Commission's reliance on antitrust policy to regulate shipping conference agreements under a public interest standard only after finding that reliance appropriate in light of the expressed congressional intent. Section 15 of the Shipping Act gives the Commission broad power to "disapprove, cancel or modify any agreement, or any modification thereof . . . that it finds to be unjustly discriminatory or unfair . . . or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest." 46 U.S.C. § 814. Agreements approved by the Commission are exempt from the antitrust laws. *Id.* Taking its cue from the legislative history, the Supreme Court explained that Congress had concluded that the advantages of regular shipping service, uniform and stable rates, and efficient service could not be achieved in the face of unrestricted competition and had therefore created the exemption. But, the Court said, the exemption was not an unqualified gift to the shipping industry; that is, it did not amount to a license to violate the antitrust laws when the object of the unlawful activity was unrelated to the goals the exemption was intended to serve. The Court said that Congress had authorized the Commission to disapprove agreements under the public interest standard on the ground that their anticompetitive implications outweigh benefits related to the statutory goals. *Id.* at 242–46.[49]

The EPA Administrator does not have authority to regulate either the motor vehicle manufacturing industry or the State of California under a broad charter to advance the public interest. The phrase "the public interest" does not even appear in sections 202 and 209. The Clean Air Act does not have its genesis in congressional concern about business competition or antitrust matters. The motor vehicle manufacturers enjoy no exemption from the antitrust laws. As the Administrator has consistently held since first vested with the waiver authority, his inquiry under section 209 is modest in scope. He has no "broad and impressive" authority to modify California regulations.

The Administrator's decision to waive federal preemption for the in-use maintenance regulations does no violence to the concerns about anticompetitiveness reflected in section 207. Nothing in that section forbids encouraging the production of more durable emission-related parts. Congress' intent was to prohibit manufacturers from requiring that maintenance on warranted parts be done by the manufacturer and franchised dealerships.[50] The CARB's

**49.** The other cases to which petitioners refer do not warrant extended discussion. Like *Amerika Linien, United States Lines, Inc. v. FMC,* 189 U.S.App.D.C. 361, 584 F.2d 519 (1978), involved the Shipping Act; like *Gulf State Utilities, Northern Natural Gas Co. v. FPC,* 130 U.S.App.D.C. 220, 399 F.2d 953 (1968), involved the Federal Power Act. Each of these cases turned on the broad "public interest" standard under which the FMC and the FPC (now FERC) operate and on the legislative history of the statutes indicating congressional intent to include antitrust policy within the scope of that standard. *McLean Trucking Co. v. United States,* 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944), is clearly inapposite, for in that case the Court did not even have to imply the content of the ICC's "public interest" standard from the structure of the statute or its legislative history; Congress had expressly declared that antitrust policy was to be a factor in the ICC's determinations. *See* 321 U.S. at 82 & n.16, 64 S.Ct. 370.

**50.** The CARB's regulations do not violate section 207(c)(3)(B), which directs that the written instructions

> shall not include any condition on the ultimate purchaser's using, in connection with such vehicle or engine, any component or service (other than a component or service provided without charge under the terms of

regulations do not favor one segment of the parts and services industry over another; they are neutral on where the maintenance will be done. They will therefore have no direct effect on the vehicle owner's decision to patronize the original equipment manufacturer or the aftermarket industry at the time any component needs to be replaced. Petitioners' complaint is really with the warranty obligations themselves, and they must address those complaints to Congress, which created the obligations, rather than to the Administrator.

## V

### THE WAIVER PROCEEDING

■ We have determined that in a section 209 proceeding involving accompanying enforcement procedures relating to standards for which a waiver has already been granted the Administrator must address (1) whether the procedures endanger the protectiveness of California's standards and (2) whether the procedures are consistent with the intent of section 202(a). The next question for decision requires us to resolve how the Administrator must go about addressing these concerns.

On petitioners' analysis, section 209(b) imposes on California the burden of demonstrating that the waiver is lawful and further requires the Administrator to find on the record that California has met this burden. This last requirement, say petitioners, requires the Administrator to find that the California *regulations* are not arbitrary and capricious and are consistent with section 202(a) before granting the waiver. The Administrator contends that those favoring denial of the waiver carry the burden of demonstrating that the waiver should not be granted, and that his obligation is to grant the waiver if that burden is not met.

Our starting point is the statute. Subsection (b) begins: "The Administrator *shall,*

after notice and public hearing, *waive* application" of federal preemption for California "if the *State* determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards." 42 U.S.C. § 7543(b) (Supp. I 1977) (emphasis added). The only pre-waiver conditions this language imposes are that the Administrator find that California has made a protectiveness determination and that he hold a public hearing. It does not require *him* to find that the standards are at least as protective of public health and welfare as applicable federal standards. It does not say he "may" grant a waiver once California makes the determination and he holds a public hearing. It instead contains an imperative to do an act—*grant* the waiver after a hearing—once California has made the protectiveness determination.

■ The requirement of a public hearing is a clue that his task is something more than ministerial. The second sentence of subsection (b) confirms the suspicion. It provides that the Administrator must deny the waiver if he makes one of three findings—that the *protectiveness determination* (as opposed to the regulations which protect) was arbitrary and capricious; that the State does not need the standards; or that the standard and enforcement procedures are inconsistent with section 202(a). It is not necessary for the Administrator affirmatively to find that these conditions do not exist before granting a waiver. The statute does not say "the Administrator shall grant a waiver only if" he makes the negative of these findings. That he must deny a waiver if certain facts exist does not mean that he must independently proceed to make the opposite of those findings before he grants the waiver regardless of the state of the record. If the Administrator has an obligation to deal with these factual findings it must arise out of the public hearing

---

the purchase agreement) which is identified by brand, trade, or corporate name; or directly or indirectly distinguishing between service performed by the franchised dealers of such manufacturer or any other service establishments with which such manufactur-

er has a commercial relationship, and service performed by independent automotive repair facilities with which such manufacturer has no commercial relationship.

42 U.S.C. § 7541(c)(3)(B) (Supp. I 1977); *see* note 68 *infra.*

held to discuss them. The language of the statute and its legislative history indicate that California's regulations, and California's determination that they comply with the statute, when presented to the Administrator are presumed to satisfy the waiver requirements and that the burden of proving otherwise is on whoever attacks them. California must present its regulations and findings at the hearing, and thereafter the parties opposing the waiver request bear the burden of persuading the Administrator that the waiver request should be denied.

As noted, the legislative history makes clear that the burden of proof lies with the parties favoring denial of the waiver. Petitioners lost the battle they now wage twelve years ago when Congress specifically declined to adopt a provision which would have imposed on California the burden to demonstrate that it met the waiver requirements. As noted, the Senate version of the Air Quality Act of 1967 contained the language which was ultimately adopted by Congress. It vested the power to make the protectiveness determination in California and sharply restricted the Secretary's role in a waiver proceeding. The Senate Report explained that under the proposal the "Secretary is *required* to waive application *unless* he finds" one of the factual circumstances set out in section 209(b)(1)(A)–(C). S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) (emphasis added).

The House Committee changed this arrangement. It was persuaded by the comments of manufacturers that the separate administration of two different sets of emission regulations would unduly burden the industry. H.R. Rep. No. 728, 90th Cong., 1st Sess. 21–22 (1967). It therefore amended the Senate's language to provide that the Secretary "may" waive application of the preemption provision "upon a showing by California" that its standards were more stringent than applicable federal standards. *Id.* at 22; *see id.* at 69. In a separate statement accompanying the House Committee Report which explained this amendment, two Representatives vigorously protested this change, complaining that it improperly placed the burden on California to demonstrate the value of the waiver and thereby undermined the importance of the California exception. *Id.* at 96 (separate views of Reps. Moss and Van Deerlin).

On the floor of the House one of these dissenting Committee members offered an amendment to the bill which replaced the Committee language with the Senate proposal. 113 Cong.Rec. 30975 (1967) (remarks of Rep. Moss). The ensuing debate focused on the wisdom and need of requiring California to justify each of its emission control regulations to a federal officer.[51] At the close of the debate, the House adopted the amendment, thereby rejecting language which would have imposed the burden on California and accepting language which places the burden on those who allege, in effect, that the national program is adequate to California's needs. The Adminis-

---

**51.** In their reply brief, petitioners suggest that the history of the 1967 enactment "is ambiguous on the question of the burden of persuasion," citing one remark of "a supporter of the version of Section 209(b) adopted in 1967" to the effect that "California 'would have the burden of proof.'" Joint Reply Br. of Petitioners at 19 n.12 (citing 113 Cong.Rec. 30979 (1967) (remarks of Rep. Harvey)). In fact, while remarks of some Congressmen are not always authoritative, the legislative history could not be less ambiguous on this question. The precise issue of the difference between the Senate and House versions of the bill as it related to the burden of persuasion was carefully explained on the floor. *See* 113 Cong.Rec. 30950 (1967) (remarks of Rep. Holifield). After Rep. Moss offered his amendment to the House Committee version, explaining that it contained

"the same language, word for word, as was adopted unanimously by [the Senate]," *id.* at 30975, several other members again explained the difference between the House Committee version and the Senate version, specifically emphasizing that California carried the burden under the former but not the latter, *see, e. g.,* 113 Cong.Rec. 30976 (1967) (remarks of Rep. Wilson); *id.* at 30977 (remarks of Rep. Roybal). The comment to which petitioners advert was made during the debate on the Moss amendment by a member who rose *in opposition* to that amendment, *id.* at 30979 (remarks of Rep. Harvey), and was part of his persistent effort to minimize the difference between the two versions, *see id.* at 30952 (remarks of Rep. Harvey). The House found those efforts unconvincing, and we must abide by that judgment.

trator has consistently adhered to that choice since then, see, e. g., 40 Fed.Reg. 30311, 30314 (1975), and Congress expressed general approval of the Administrator's waiver decisions in amending section 209 in 1977, see H.R. Rep. No. 294, 95th Cong., 1st Sess. 301 (1977).[52]

Petitioners have an opportunity to meet this burden at the hearing the Administrator must conduct before granting a waiver. If they have a case—if in fact the circumstances exist in which Congress declared that "no such waiver shall be granted"—then petitioners have nothing to fear, for the hearing cannot be and is not an idle exercise. The Administrator is not entitled to ignore the evidence adduced at the hearing. He must consider all evidence that passes the threshold test of materiality and he must thereafter assess such material evidence against a standard of proof to determine whether the parties favoring a denial of the waiver have shown that the factual circumstances exist in which Congress intended denial of the waiver.

The standard of proof must take account of the nature of the risk of error involved in any given decision, and it therefore varies with the finding involved.[53] We need not decide how this standard operates in every waiver proceeding. Since this proceeding involved enforcement procedures, the only findings of relevance are whether the procedures impact on California's protectiveness determination and whether they are consistent with section 202's concern with technological feasibility. The Administrator held that there must be "clear and compelling evidence" to show that proposed procedures undermine the protectiveness of California's standards, and this holding has strong support in the legislative history.[54] It also accords with the congressional intent to provide California with the broadest possible discretion in setting regulations it finds protective of the public health and welfare. The Administrator did not expressly describe a standard of proof for the section 202(a) inquiry, but we have elsewhere held that the "preponderance of the evidence" standard governs inquiry into technological feasibility,[55] and we do not understand the Administrator to dispute that measurement here. This standard accords with Congress' intent to minimize economic disruption in manufacturing.

The public hearing on California's waiver request, and the record displaying the evidence adduced therein, ensure that a court will be able to conduct meaningful review of the Administrator's waiver decisions. This is the concern animating our decision in International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615 (1973), which each of the parties attempt to embrace as their own. In that case, the EPA denied an application for suspension of emission standards sought under a provision of the Clean Air Act which imposed on the applicant the burden of demonstrating

---

**52.** It is noteworthy that this allocation of the persuasion burden is consistent with general principles governing allocation of burdens. Because section 209 requires the Administrator to grant a waiver unless he makes certain findings, the denial of the waiver is the order to be promoted in a waiver proceeding. Proponents of an order usually bear the burden of showing the order is appropriate. See K. Davis, Administrative Law Treatise § 6:15 (2d ed. 1978). Here petitioners are the proponent of the order denying the waiver. Similarly, the burden of proof typically follows the party in control of the relevant information. When technological feasibility is in issue, the manufacturers are the ones in possession of the relevant information.

**53.** International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 438, 478 F.2d 615, 642 (1973); K. C. Davis, supra note 52, § 6:15.

**54.** The House Report on the 1977 amendments cautioned:

> The Administrator . . . is not to overturn California's judgment lightly. Nor is he to substitute his judgment for that of the State. There must be *clear and compelling evidence* that the State acted unreasonably in evaluating the relative risks of various pollutants in light of the air quality, topography, photochemistry, and climate in that State, before the EPA may deny a waiver.

H.R.Rep. No. 294, 95th Cong., 1st Sess. 302 (1977) (emphasis added), U.S. Code Cong. & Admin.News 1977, p. 1381.

**55.** International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 438, 478 F.2d 615, 642 (1973).

the unavailability of effective control technology. The statute explicitly placed the burden of persuasion on the applicants. The standard of proof the applicants had to meet was a preponderance of the evidence. Noting that the applicants had submitted all the data in their possession *and* that the Administrator did not ask for more, the court was disturbed by the fact the Administrator had relied on his own methodology and predictions in arriving at a factual determination contrary to the applicants' data. Believing that the applicants had met the standard of proof with their data, the court held that the burden of proof shifted to the Administrator to demonstrate that his methodology and predictions were reliable. *Id.* 155 U.S.App.D.C. at 438–39, 478 F.2d at 642–43.

*International Harvester's* reasoning represented neither a substantive judgment that the emission standards were in fact beyond current and projected technological capabilities nor a strictly procedural judgment that the burden shifts as it might in a normal civil trial setting. Rather the use of the burden of proof was meant to structure and facilitate judicial review. The burden "shifted" to the agency as a necessary incident of its obligation to give reasoned consideration to the issues before it. The Administrator, the court said, must sustain the "burden of adducing a reasoned presenta-

tion supporting the reliability of the [EPA's] methodology." *Id.* 155 U.S.App.D.C. at 439, 478 F.2d at 643. That is, he had to explain why his methods were superior to the data the applicants had submitted and thereby adequate to support the agency's rejection of the applicant's data. Only with such an explanation could the court determine whether the Administrator had acted reasonably.

▮▮▮▮ Here, too, if the Administrator ignores evidence demonstrating that the waiver should not be granted, or if he seeks to overcome that evidence with unsupported assertions of his own, he runs the risk of having his waiver decision set aside as arbitrary and capricious. His "burden" is the burden of acting reasonably.[56]

## VI

## THE WAIVER DECISION

It remains to be seen whether there is a discernible rational basis for the Administrator's decision to waive federal preemption for the in-use maintenance regulations. In light of the foregoing, this leaves two matters for consideration. First, did the Administrator reasonably conclude that there was no clear and compelling evidence to show that the regulations would undermine the protectiveness determination Cali-

---

**56.** As we noted in the preface to our analysis, the Administrator like every other administrative officer must give reasoned consideration to the issues before him, but the extent of the consideration he is required to give depends on the statute under which he is operating. This principle explains why this case differs from those petitioners cite in support of their argument that the Administrator has an affirmative obligation to make negative findings. Thus, for example, our holdings that agencies required to prepare environmental impact statements under the National Environmental Policy Act cannot sit back, "like an umpire, and resolve adversary contentions" presented to them turn on the fact that NEPA places primary responsibility for its enforcement in the hands of the agencies. *See State of Alaska v. Andrus*, 188 U.S.App.D.C. 202, 210, 580 F.2d 465, 473 (1978); *Calvert Cliffs' Coordinating Committee, Inc. v. AEC*, 146 U.S.App.D.C. 33, 43, 449 F.2d 1109, 1119 (1971). NEPA "states that every federal agency *shall* consider ecological factors when

dealing with activities which may have an impact on man's environment." *Zabel v. Tabb*, 430 F.2d 199, 211 (5th Cir. 1970) (emphasis added). Similarly, in the other case petitioners cite, *Citizens Committee to Save WEFM v. FCC*, 165 U.S.App.D.C. 185, 506 F.2d 246 (1974) (en banc), we held that the FCC's performance of its regulatory role did not depend "upon the assiduousness" of private parties because the agency had a "mandate to approve applications consistent with the public interest." *Id.* 165 U.S.App.D.C. at 201 n.21, at 262 n.21. These cases do not hold that regardless of the statute involved the agency always bears the burden of demonstrating a particular state of facts exist. Rather they turn on the special mandate involved. Here the Administrator has *no broad mandate to assure that California's* emissions control program conforms to the Administrator's perceptions of the public interest. Absent the contingency that he is able to make contrary findings, his role with respect to the California program is largely ministerial.

fornia made with respect to the standards to which the regulations relate? Second, did the Administrator reasonably conclude that petitioners failed to meet their burden of demonstrating that the in-use maintenance regulations were inconsistent with the intent of section 202(a)?

A. *The Protectiveness Determination*

Almost all petitioners' assertions on this point relate to the Administrator's failure to explore whether the in-use maintenance regulations were themselves arbitrary and capricious, which as noted is not a question for the Administrator or this court. Once California has come forward with a finding that the procedures it seeks to adopt will not undermine the protectiveness of its standards, parties opposing the waiver request must show that this finding is unreasonable. Petitioners claim to have done so, but we can find no evidence in the record to support that assertion.

Petitioners refer to four documents in the record ostensibly related to the effect of the standards on public health and welfare. The first is a letter from a representative of General Motors Corporation to the EPA which declares that the major issue in the waiver proceeding ought to be whether California needed the in-use maintenance regulations.[57] Setting aside the fact that this assertion relates to an inquiry not relevant to a waiver involving enforcement procedures, the statement itself is not evidence but an argument. The letter advances Gen-

eral Motors' "belief" that the in-use regulations might imperil the protectiveness of California's standards, but it offers no evidence to support that belief. In light of the voluminous record developed before the CARB and the EPA, it is not unreasonable, if the claim were true, to expect that petitioners should be able to point to some data backing up that assertion.

The second document is also a product of General Motors and also predominately relates to the "need" inquiry that is inapplicable to this proceeding.[58] This document too fails to point to any evidence regarding the risks ostensibly attending the regulations and instead focuses on the allegedly flawed studies the CARB undertook to demonstrate the public health benefits of the in-use maintenance regulations. There is certainly room for disagreement about the potential benefits of the in-use maintenance regulations; the CARB staff conceded that it could not precisely identify the emissions-related benefits to be derived from the regulations alone.[59] Moreover, there is room for disagreement about the exact meaning of the studies used by the CARB. But we cannot substitute our judgment about this data for that of the officials charged with interpreting it.

The other two documents petitioners cite are similarly inadequate. One is an unsupported assertion made by a representative of the Ford Motor Company relating to the potential public health effects of the in-use

---

**57.** Letter from T.M. Fisher to Benjamin R. Jackson (August 26, 1977), *reprinted in* J.A. 1281–82 (cited in Joint Br. for Petitioners at 59, 65).

**58.** General Motors Corp., Analysis of Reports Used by the California Air Resources Board to Support the Restricted Maintenance Regulations 5–8 (submitted to the EPA February 1978), *reprinted in* J.A. at 1803–06 (cited in Joint Br. for Petitioners at 59, 65).

**59.** *See* California Air Resources Board, Staff Report No. 77–12–1, 19–28 (May 26, 1977), *reprinted in* J.A. at 180–89; California Air Resources Board, Staff Report No. 77–9–2, 21–28 (April 28, 1977), *reprinted in* J.A. at 146–53. Coupling the other new regulations (such as inspection procedures) with its new mainte-

nance regulations, the CARB staff predicted a reduction in:

> hydrocarbons by 4 tons/day, carbon monoxide by 73 tons/day, and oxides of nitrogen by 3 tons/day in the South Coast Air Basin in 1990. These reductions represent 1.5%, 2.5%, and 0.5% of the total motor vehicle emissions at that time . . . . In addition, the proposed maintenance regulations will strongly enhance public acceptance for the [Motor Vehicle Inspection Program], and increase the chances for its success.

California Air Resources Board, Staff Report No. 77–12–1, *supra*, at 28, J.A. at 189. We have no basis other than petitioners' unsubstantiated say-so that this prediction is not trustworthy.

maintenance regulations.[60] The other has nothing to do with public health at all, but instead appears to be an examination of the technological feasibility of the proposed regulations.[61]

The Administrator did not specifically discuss any of these documents in his waiver decision; he simply held that there was no evidence in the record to support a finding that the regulations undermined the protectiveness of the California standards. Having reviewed the documents petitioners insist suggest otherwise, we agree with the Administrator.

### B. *Technological Feasibility*

We find it necessary to address only three of the claims petitioners advance under this heading.[62]

First, petitioners complain that the Administrator "failed to consider—and certainly did not address—the fundamental technological issue raised by the manufacturers: the reliability of [the C]ARB's methodology." Joint Br. for Petitioners at 72. It is important in understanding this claim to appreciate petitioners' dilemma:

The restrictions on allowable maintenance are the same in-use as they are during the certification process. Yet petitioners do not here challenge the applicability of the regulations to certification. They thus are in the position of having to argue that while it is technologically feasible to construct a prototype vehicle that will pass certification testing and receive a certificate of conformity, it is not technologically feasible to construct a motor vehicle based on the prototype which will meet the standards and procedures in actual use.

Petitioners say that the problem with basing in-use feasibility judgments on certification test procedures is that the latter do not take account of deterioration over time, weather conditions, and the like—that is, those things which affect a motor vehicle in actual use but which are not considered during certification. For example, the prototype used during certification is subjected only to a mileage interval test; our technology does not yet permit the simulation of time. Nor do certification procedures test for extreme driving conditions, or changes in climate. Petitioners contend that manufacturers commonly make maintenance rec-

---

**60.** Environmental Protection Agency, Transcript of Public Hearing on California Waiver Request 133 (Aug. 3, 1977) (statement of Ms. Petrauskas), *reprinted in* J.A. at 3413 (cited in Joint Br. for Petitioners at 59). The following colloquy appears in the record immediately following this statement:

> MR. KRUSE [Member, EPA Hearing Panel]: What is your reaction to the data CARB presented which indicates your recommended maintenance is not being performed by the vehicle owners?
>
> MR. WEAVER [Emissions Planning Associate, Ford Motor Co.]: I guess we have to accept that some of that is true, and where it has been demonstrated that this lack of maintenance is contributing to air quality problems, we are doing everything we can to produce maintenance-free parts.
>
> MR. KRUSE: Do you have any data of your own which you can supply?
>
> MR. WEAVER: No.

**61.** General Motors Corp., Statement to the California Air Resources Board on Proposed Changes in Allowable Maintenance 8–10 (May 26, 1977), *reprinted in* J.A. at 3310–12 (cited in Joint Br. for Petitioners at 65).

**62.** We have already disposed of petitioners' argument that the "cost of compliance" consideration requires the Administrator to develop a cost-effectiveness study of the in-use maintenance regulations. *See* note 40 *supra*.

In a separate brief, intervenor The Automobile Importers of America ("AIA") argues that the Administrator ignored the need of manufacturers of imported motor vehicles for adequate lead time to comply with the regulations. Its complaint is based on the fact that most importers have not yet begun to use breakerless high-energy ignition systems, which are important in extending the useful life of spark plugs and otherwise reducing the maintenance needed for other ignition parts. AIA refers to no evidence supporting its assertion that it will not have the adequate lead time to incorporate the newer ignition system. The record shows that the newer system itself is "virtually [an] off-the-shelf ite[m]." California Air Resources Board, Staff Report No. 77–12–1, 18 (May 26, 1977), *reprinted in* J.A. at 179. Its argument is therefore unpersuasive.

The balance of the manufacturers' technological feasibility arguments not discussed herein are either moot, *see* note 64 *infra*, or based on undocumented assertions that do not merit discussion.

ommendations based on such factors. They contend that the CARB study is fatally flawed because it completely ignores the maintenance needed to take account of factors peculiar to actual driving conditions in favor of reliance on maintenance needed during a procedure that does not accurately reflect actual driving conditions. This focus, petitioners maintain, is inherently unreliable and undermines the foundation of the CARB's conclusion that the regulations are in fact technologically feasible.

Petitioners' argument hails from *International Harvester*. As noted, in that case the EPA interposed a methodology of its own to demonstrate that effective control technology would be available when needed; it used this methodology to offset the manufacturers' contrary data. The court held that the EPA had the "burden" of demonstrating that its methodology was sufficiently reliable to permit a finding of technological feasibility. Wrapping themselves in the cloth spun by this reasoning, petitioners contend that the Administrator carries the burden of demonstrating the reliability of the CARB's technological feasibility studies.

The cloak petitioners purport to see in *International Harvester* does not exist. It is initially noteworthy that the study to which petitioners refer was by no means the sole basis for the CARB's conclusions. The recommendations based on that study were significantly altered after continued examination and solicitation of comments from manufacturers.[63] More important, the question for the Administrator is not whether the CARB's data is reliable, but whether the manufacturers' current and projected capabilities permit them to meet the in-use maintenance regulations. It was incumbent upon the manufacturers to come forward with *evidence* that the regulations were technologically infeasible. As in *International Harvester*, the Administrator's reliance on other data is germane only if the manufacturers have produced such evidence. If the record does not yield evidence of technological infeasibility, petitioners lose.

Second, petitioners claim that they did indeed demonstrate technological infeasibility. There is little evidence in the record to support that assertion, however. Most of petitioners' fears turn on the manufacturers' earlier inability to recommend maintenance to purchasers—recommendations which they wanted to make to reflect actual in-use driving conditions—but these complaints have since become moot.[64] The only *evidence* in the record tending to show inadequate lead time is some test data indicating a significant decrease in drive belt tension after initial operation, data which might lead to the conclusion that the CARB's estimates on maintenance intervals for drive belt tension are unrealistic. As the Administrator pointed out, however, the same evidence indicated that the drive belt tension stabilized after the initial period and the greatest drop-off occurred during the first twenty miles of the vehicle's use. On this basis the Administrator concluded that a pre-sale dealer check of the drive belt tension would relieve the manufacturers' complaint. We can find no other evi-

63. *See* notes 15 & 16 *supra*. Still, the CARB did rely on mileage intervals to shape its in-use maintenance regulations. To set aside the Administrator's decision to waive the regulations, however, this court requires persuasive evidence that the manufacturers cannot comply with them in light of current and projected technology. On this record, the manufacturers have failed to advance any evidence attesting to that.

64. *See* note 18 *supra*. One argument was that if manufacturers could not recommend maintenance there would be no assurance that certain parts (particularly air filters, fuel filters, hoses and tubing) would last for the specified mileage. Another related to possible safety implications of restricting recommended maintenance. The CARB's emergency amendments permit manufacturers to recommend additional maintenance, and thus these arguments are no longer properly before us.

Because we find the manufacturers did not meet their burden on the alleged inconsistency of the in-use maintenance regulations with section 202(a), we need not discuss whether the Administrator acted improperly in relying on an EPA staff synopsis of the waiver proceeding record.

dence in the record supporting a conclusion of inadequate lead time for the requisite technology.

Third, petitioners assert that the Administrator should have found the in-use maintenance regulations inconsistent with the intent of section 202(a) because the CARB made no showing that more durable parts will lead to effective emissions control and because the in-use maintenance regulations will inhibit the development of emission-related technology. We fail to see how these assertions relate to technological feasibility. The first proposition—that there is no evidence to support the idea that more durable parts will lead to effective emissions control—rests on some data indicating that short replacement intervals for spark plugs reduces emissions. This may be true, but it does not mean that spark plugs cannot be equally effective on longer maintenance intervals, or for that matter, that the manufacturers cannot build the spark plugs to last the longer interval. The second proposition—that the regulations will inhibit the development of new emissions technology—rests on the idea that because new technology generally requires more maintenance manufacturers will not develop it. This is, as the Administrator aptly labeled it, "speculation." It is also improbable given the clear economic incentive for manufacturers to develop and improve emissions control technology.

## VIII

## THE CONSTITUTIONAL ARGUMENTS

We need not linger long on our final inquiry. Petitioners make two constitutionally-based challenges to the Administrator's waiver decision and its consequences. These challenges are without merit.

Petitioners' first amendment claim is that the in-use maintenance regulations unlawfully burden the manufacturers' right to communicate with their customers. We disagree. The regulations permit manufacturers to recommend maintenance reasonable and necessary to ensure the safe operation of the motor vehicle.[65] Otherwise the regulations simply require manufacturers to make clear that maintenance which is *required* for warranty purposes and that which is merely *recommended.* Although commercial speech is now protected by the first amendment,[66] regulation of such speech having a reasonable basis in a legitimate governmental policy is lawful.[67] The CARB determined that the failure of in-use vehicles to meet emissions standards was partly tied to the amount of maintenance a vehicle owner performs (or fails to perform) on emission-related parts. The animating concern was with air quality, a legitimate object of governmental attention. It decided to address this problem by reducing the amount of maintenance needed to be performed on emission-related parts and thereby encourage the production of more durable parts. As part of this effort, it decided to limit the amount of maintenance a manufacturer can demand of motor vehicle owners. Congress contemplated a comparable limitation in enacting section 207. This limitation is reasonably related to a legitimate governmental goal. It therefore passes constitutional muster.

As for petitioners' due process claim, it is well settled that Congress is entitled to create statutory rights and liabilities that are rationally related to a legitimate governmental interest.[68] It did so in

**65.** *See* note 18 *supra.*

**66.** *Bates v. State Bar of Arizona,* 433 U.S. 350, 363–66, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 761–70, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

**67.** *Banzhaf v. FCC,* 132 U.S.App.D.C. 14, 34, 405 F.2d 1082, 1102 (1968), *cert. denied,* 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969), *cited with approval in Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 772 n.24, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *see Young v. Mini Theatres, Inc.,* 427 U.S. 50, 68, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1975).

**68.** *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 16, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976); *Lichter v. United States,* 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948).

section 207. The California in-use maintenance regulations do not alter the statutory defenses to those liabilities. Instead they make those defenses consistent with California's determination that motor vehicles can be designed to be operated with less maintenance than is currently the case. That this determination does not meet with the manufacturers' expectations or desires is no basis for holding the regulations unconstitutional.

## IX

### CONCLUSION

■■■■ Congress has decided to grant California the broadest possible discretion in adopting and enforcing standards for the control of emissions from new motor vehicles. Section 209 of the Clean Air Act requires the Administrator to waive federal preemption of motor vehicle emission control standards and accompanying enforcement procedures for the State of California unless he makes certain findings that such a waiver is inappropriate. This power encompasses the power to waive federal preemption for in-use maintenance regulations designed as enforcement procedures for pre-existing standards. In evaluating whether a waiver is appropriate for enforcement procedures relating to standards for which a waiver has already been granted, the Administrator is required to address whether the procedures endanger the protectiveness of California's standards and whether the procedures are consistent with section 202(a) of the Clean Air Act. Those favoring the denial of the waiver carry the burden of demonstrating that the waiver is inappropriate. The petitioners here failed to carry that burden. Their request to set aside the Administrator's waiver decision is therefore denied. It is

*So ordered.*

---

Like the first amendment claim, this argument too is partly moot owing to the CARB's emergency amendments. *See* notes 18 & 64 *supra.* Moreover, like certain of the petitioners' other contentions, this argument partly

draws support on proposed warranty regulations which the CARB has adopted. The Administrator has not waived preemption of these regulations, however, and hence they are not properly before us.